1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6
7  UNITED STATES OF AMERICA,⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣)
8  ⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣Plaintiff,⁣⁣)  Case No. 2:12-cr-00147-KJD-PAL

)
9  vs.⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣)  **REPORT OF FINDINGS AND**
⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣)  **RECOMMENDATION**
10 CALVIN EUGENE O'HARA,⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣)  (Mot. Suppress - Dkt. #25)
11 ⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣Defendant.⁣⁣)
12 _____)

13      Before the court is Defendant Calvin Eugene O'Hara's ("O'Hara") Motion to Suppress
14 Evidence for Fourth Amendment Violation (Dkt. #25) which was referred to the undersigned for a
15 Report of Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1-4.
16 The court has considered the Motion, the government's Response (Dkt. #31), the government's Notice
17 of Manual Filing and Attached Disc (Dkt. #32), Defendant's Reply (Dkt. #33), and testimony taken at
18 an evidentiary hearing held on April 25, 2013.  Christina Silva appeared on behalf of the government,
19 and Paul Riddle appeared on behalf of the Defendant.

20                                                    **BACKGROUND**

21      O'Hara is charged in an Indictment (Dkt. #1) returned May 1, 2012, with felon in possession of
22 a firearm in violation of 18 U.S.C. § 922(g)(1)(A) and 924(a)(2).  The indictment arises out of an arrest
23 made by officers of the Las Vegas Metropolitan Police Department ("LVMPD") on July 15, 2010.  The
24 officers responded to a 911 caller reporting persons in a black Chevrolet Suburban parked on the street
25 were possibly dealing drugs in the neighborhood of Rou Circle and Morris Street.  Two officers were
26 dispatched to the scene.  Their investigation ultimately resulted in O'Hara's arrest on a state charge of
27 prohibited person in possession of a firearm.

28 / / /

I. **The Parties' Positions.**

A. **O'Hara's Motion to Suppress.**

In the current motion, O'Hara seeks to suppress evidence seized from the inventory search of the vehicle arguing his Fourth Amendment rights were violated when LVMPD officers seized him at gunpoint and ordered him out of the vehicle. O'Hara also argues that he was seized without probable cause or reasonable suspicion. Specifically, he argues that a phone call from an unproven source is insufficient to establish probable cause or reasonable suspicion for the type of seizure that occurred in this case. The only information the LVMPD officers had at the time of the seizure was that a caller had identified a car on the street and suspected that the occupants were casing the neighborhood to deal drugs. Citing *Florida v. J.L.*, 529 U.S. 266 (2000), O'Hara argues that this information was insufficient to conduct a traffic stop, or seize the occupants. Thus, the court should suppress all tangible evidence seized as the result of the traffic stop and search of the vehicle.

B. **The Government's Response.**

The government opposes the motion, arguing O'Hara lacks standing to challenge the search of the vehicle because he had no expectation of privacy in the vehicle or its contents. O'Hara was merely a passenger in the vehicle. The vehicle belonged to Alamo Rent-a-Car and police were informed at the scene that the person who rented the vehicle, Emily Samples, was the only person permitted to possess the vehicle. Neither the Defendant nor any of the other occupants of the vehicle had a possessory interest in it or authority from the vehicle's owner to possess it. Thus, O'Hara had no reasonable expectation of privacy in the vehicle or its contents.

Second, the government argues that O'Hara was not unreasonably or unlawfully seized by the LVMPD officers prior to a search of the vehicle. The government claims that the LVMPD officers responding to this call merely approached the vehicle on a public street and requested the occupants to exit the vehicle. The government disputes that the officers approached the vehicle with weapons drawn and ordered the occupants out at gunpoint. Relying on *United States v. Washington*, 490 F.3d 765, 770 (9th. Cir. 2007), the government argues that when a police officer merely identifies himself to a person and poses questions, no Fourth Amendment seizure occurs.

/ / /

2

1    The government claims that when the officers approached the vehicle, they smelled a strong
2    odor of marijuana emanating from the vehicle which created reasonable suspicion to conduct an
3    investigation.  The odor of marijuana emanating from the vehicle also gave the officers reasonable
4    suspicion to require O'Hara and the other occupants to exit the vehicle to conduct an investigation, and
5    created probable cause to search the vehicle.  The vehicle was not searched until after a canine officer
6    and his detector dog, Flirt, conducted a sweep of the vehicle's exterior.  The dog alerted to the presence
7    of illegal narcotics inside the vehicle which "solidified the probable cause that drug offenses had been
8    or were being committed within the vehicle."  The government claims that during the sweep by the dog,
9    Officer Kunz observed a green, leafy substance believed to be marijuana on top of the vehicle's center
10   console.  Canine Officer Ledogar and his dog also located a clear, plastic bag that contained numerous
11   individually wrapped white, rock-like substances between the passenger seat and the center console.

12   Subsequent investigation revealed that the vehicle belonged to Alamo Rent-a-Car and that none
13   of the occupants were authorized to drive it.  Alamo requested that the car be towed.  An inventory
14   search of the vehicle's contents was conducted before it was towed pursuant to standard LVMPD
15   policy.  During the inventory search, two firearms were found in the glove box.  At the time the
16   firearms were discovered, the officers were aware from a records check that O'Hara and one other
17   occupant of the vehicle had prior felony convictions.  As a result, Officer Kunz terminated the vehicle
18   inventory search and contacted detectives in the LVMPD Firearms Investigations Section.  Detective
19   Orth responded to the scene and applied for and obtained a telephonic search warrant to search the
20   vehicle.  While executing the search warrant, Detective Orth recovered a Ruger pistol and an INA .38
21   caliber revolver from the vehicle's front glove box.  Detective Orth then arrested O'Hara for prohibited
22   person in possession of a firearm.  Under these circumstances, the government argues, no Fourth
23   Amendment violation occurred, and the evidence seized from the vehicle should not be suppressed.

24   **C.    O'Hara's Reply**.
25   O'Hara replies that he had a sufficient expectation of privacy in the vehicle to have standing to
26   seek to suppress the firearms found by law enforcement.  He claims that if granted an evidentiary
27   hearing, he would present evidence sufficient to demonstrate that he possessed a reasonable expectation
28   of privacy in the vehicle.  The motion claims that the driver of the vehicle believed he had authorization

3

1    to use the car.  O'Hara also believed that the vehicle was lawfully possessed and that he had a

2    subjective expectation of privacy in the vehicle and its contents.  O'Hara argues that even if he did not

3    have a reasonable expectation of privacy in the vehicle, he has standing to challenge the reasonableness

4    of the seizure of evidence from the vehicle.  The reply reiterates arguments that O'Hara was unlawfully

5    seized when the officers approached the vehicle with their weapons drawn, and that the officers lacked

6    reasonable suspicion to conduct a traffic stop.

7    **II.**    <u>**The Evidence Before the Court**</u>.

8         At the evidentiary hearing, the government called the two officers involved in this stop and

9    arrest, Eric Morris, and P. Kunz.  The defense called Sean Deaver.

10         **A.**    **Testimony of Eric Morris**.

11         Officer Morris has been employed by LVMPD for five years and was assigned to the Problem

12    Solving Unit "PSU" in the Southeast Area Command on July 14, 2010, when he received a dispatch

13    shortly before midnight to respond to a call for service at Rue Circle and Morris.  The call for service

14    indicated that several neighbors were concerned about burglaries in the area and observed a suspicious

15    vehicle they had never seen before and asked for an officer to investigate.  The vehicle was described as

16    a Chevrolet Tahoe.  Morris and another officer with whom he had been on an earlier call, Officer Kunz,

17    arrived nearly simultaneously to investigate.

18         Rue Circle is a cul-de-sac.  Upon arrival, Morris observed a Chevrolet Tahoe backed into the

19    cul-de-sac with its back wheels against the curb, and the front pointed towards the only point of egress.

20    Both officers initiated their emergency lights.  Morris pulled his vehicle nose-to-nose with the

21    Chevrolet Tahoe and approached to see what the occupants were doing.  The car was parked illegally,

22    but otherwise, Morris did not observe the occupants engaging in any illegal activity.  As he approached

23    the vehicle, the windows were down, and he detected a strong odor of marijuana.

24         Morris did not recall if he or the other officer drew their weapons, but did not believe they did

25    so given the nature of the call.  Once Morris detected the odor of marijuana, he decided to conduct a

26    probable cause search of the vehicle.  He asked the occupants of the vehicle to exit the vehicle and for

27    consent to conduct a pat down.  All three occupants of the vehicle consented to a pat down.  No

28    weapons were discovered on their persons.  The occupants of the vehicle were two men and one female.

The female had marijuana on her person.  None of the occupants of the vehicle were handcuffed before or after the pat down, and the occupants were all cooperative.

Morris called for a K-9 officer to respond.  The K-9 officer and his dog arrived in a short period of time.  The officer and his dog swept the exterior of the vehicle and the dog alerted.  As a result of the K-9 sniff, suspected crack cocaine was recovered from the vehicle.  When the cocaine was discovered, Morris decided to arrest all three occupants for possession of cocaine.

A records check was conducted of the occupants and a registration check on the vehicle.  The records check revealed that the vehicle was a rental car.  The person who rented the vehicle was not at the scene, and the rental car company was contacted.  The rental car company said that no one other than the renter had permission to use the car and requested that the vehicle be towed.  Officers did not attempt to call the renter after the rental car company requested that the vehicle be towed.

An inventory search was conducted by Officer Kunz who found two firearms in the glove box.  At the time the firearms were discovered in the glove box, officers were aware that O'Hara and the other male occupant, Deaver, had felony convictions.  Standard LVMPD policy is to contact the Firearms Detail "whenever you find a firearm with a convicted felon."  The Firearm Detail takes over and makes the call about how to further proceed.  The area where this call was made is an apartment complex.  Morris described it as violent neighborhood that it is known to have a lot of guns.  It was also an area heavily hit with residential burglaries, narcotics, and prostitution activities.

On cross examination, Morris testified that he did not recall if he was the primary or secondary officer responding to this call, but he was the first to arrive.  He was advised by dispatch that the phone call for service was made by a neighbor.  He did not recall if the caller reported four black male adults in the vehicle, or whether the caller reported he did not see any weapons or drugs.  Morris did not write a report of this incident.  He was testifying from memory, but reviewed the firearm detective's report of this incident.  Detective Orth was not present when Morris initiated the contact with the occupants of the vehicle.

The two officers were in separate vehicles when they responded to this call.  They had both been on an earlier call together.  Rue Circle is a cul-de-sac that connects to Morris.  The SUV was backed in, in the middle of the street with two-thirds of the vehicle in the middle of the street, and the tires backed

1   up against the curb.  The officers initiated the lights on the top of their patrol vehicle upon making

2   contact with the officers.  Morris did not specifically recall if the officers shined their spotlights on the

3   occupants, but would assume so.  The occupants were two males, one in the driver seat and one in the

4   passenger seat, and a female in the back.

5          **B.      Testimony of Officer Kunz**.

6          Officer Kunz has been a patrol officer with LVMPD for six years.  He was assigned to the

7   Southeast Area Command on July 15, 2010, when he responded to a call for service at Rue Circle and

8   Morris in Las Vegas.  The person reporting the call thought a Chevrolet Tahoe parked in the cul-de-sac

9   was suspicious and asked for officers to respond.  Rue Circle is a cul-de-sac.  When he arrived in the

10  cul-de-sac, he observed the Chevrolet Tahoe backed in with the rear tires to the curb.  He activated his

11  overhead lights and made contact with the occupants with Officer Morris.  As he approached the car, he

12  smelled the strong odor of marijuana.  When he initially arrived at the scene, he immediately noticed

13  the way the Chevrolet Tahoe was parked with the rear tire against the curb which he described as "odd

14  and illegal, as if a person was set to leave rapidly."  Both officers made contact with the occupants of

15  the vehicle--two males and one female.  He did not recall whether his weapon was drawn when he

16  initially approached the vehicle, and testified he would not normally do so unless he felt a need to draw

17  his weapon.

18         A strong odor of marijuana was coming from the vehicle.  Officer Kunz also noticed a green,

19  leafy substance in a baggy on the center console.  As a result, he asked the occupants to step out of the

20  vehicle.  They complied.  He asked for permission to pat the occupants down and all three agreed.  He

21  sat all three occupants on the curb.  They were not handcuffed.  After observing the marijuana, he

22  requested a K-9 officer to respond to the scene in case there were more narcotics in the vehicle.  A K-9

23  officer and dog did a sweep of the vehicle, and the dog alerted finding a baggy of cocaine.  After the

24  cocaine was discovered, all three individuals were placed in handcuffs.  A records check on the vehicle

25  revealed that it was a rental car.  The rental car company was contacted and requested that it be towed.

26  Standard LVMPD policy is to conduct an inventory search prior to tow.  He initiated an inventory

27  search of the interior of the vehicle.  The last thing he checked was the glove box which was locked.

28  He used the keys he found inside the vehicle to unlock the glove box and found two firearms.  After

1  finding the two firearms he requested that the Firearms Detail respond because the two males in the
2  vehicle were registered felons and LVMPD policy is to call Firearms Detail when firearms are found
3  with convicted felons.

4       On cross-examination, Officer Kunz testified that he did not recall some of the details of this
5  call which occurred more than two years ago.  The firearms detective authored the police report in this
6  case.  He did not review the report before testifying and was testifying from memory.  He did not recall
7  if the call for service was the result of a 911 call.  The area of the call was a residential area.  The only
8  way in or out of the cul-de-sac was through Morris Street.  He was not aware that the person reporting
9  this call did not see the occupants of the vehicle with narcotics or weapons.  He just responded to a
10 suspicious call and saw a vehicle that matched the description dispatch provided.  Both he and Officer
11 Morris were in marked vehicles and both activated their emergency lights.  He did not recall whether
12 they also activated the spotlights on the patrol car, but this is a common practice.

13      When he initially responded to the car, he observed the vehicle parked in an odd, illegal manner
14 with both rear tires against the curb.  Prior to this call, he had been patrolling this area for three years.
15 Before approaching the car, he did not see the occupants with any drugs or see any weapons.

16      On re-direct, Office Kunz testified that when the detectives arrived, both officers gave them a
17 verbal report of what they had encountered.  He described the neighborhood where this call was made
18 as an area involving large gang activity.

19     **C.**    **The 911 Call**.

20      Counsel stipulated to the admission of the disc containing the 911 call of this event.  The 911
21 caller indicated he wanted to report a suspicious vehicle in Rue Circle and Morris.  He described the
22 vehicle as a Chevrolet Tahoe or four-door type Suburban.  He reported that this was the third time the
23 vehicle had been there and that every night there was also a white car.  He told the dispatcher he
24 thought they were dealing drugs and that the car was backed into the cul-de-sac.  He describes seeing
25 four people, whom he believed were black males in black clothing.  The dispatcher asked if he had seen
26 any drugs or weapons and he denied he had.  The dispatcher asked him to identify himself and provide
27 the number from which he was calling.  He identified himself by name and provided the phone number
28 from which he was calling as requested.

1  **D.      Testimony of Sean Deaver**.

2          Deaver testified that on July 14, 2010, he and his friends were in the front of Julie and Jessica

3  Smith's house on Rue Circle.  Deaver grew up with Julie and considers Jessica his second mom.  The

4  address is at the end of the cul-de-sac, the furthest one back on the northeast side.  Deaver had

5  previously lived in the house for some period of time and has been going over there for years.

6  However, he was not living at the house at the time.

7          His girlfriend, Emily Samples, drove him to the house in a Chevrolet Tahoe.  She had rented the

8  vehicle.  He did not recall the name of the rental car company.  He had not driven the Chevrolet Tahoe

9  and Samples was not there when the police arrived.  He was in the vehicle with Calvin O'Hara and

10  another person whose name he could not recall.  They were just hanging out and having a good time.

11  Deaver has known Calvin O'Hara since he was eight years old and Calvin was raised on the next street

12  over.

13          Deaver noticed the patrol cars flying toward the cul-de-sac like the police always do when they

14  enter the neighborhood, so he went towards the house.  The police put their patrol lights on him and

15  approached with their weapons drawn.  He was ordered to get back into the truck, so he did.  The SUV

16  was backed in to make room so other people could park. The patrol cars shined bright lights directly on

17  him.  The officers ordered the occupants to keep their hands where they could be seen.  Deaver did not

18  feel free to leave, and "wasn't even free to go to the house."

19          On cross-examination, Deaver testified that when the officers arrived, their spotlights were

20  shining inside the SUV and could see what was inside.  The spotlight was very bright.  He was not high

21  at the time.  He and O'Hara were longtime friends.  Deaver acknowledged that he had been previously

22  convicted of felonies.  He could not recall whether he had been convicted of three or four felonies.  He

23  pled guilty to possession of the firearms found in this case and is currently on five-years probation in

24  state court.  Before the officers arrived, he and O'Hara had been out there for hours.

25          In response to questions from the court, Deaver testified that the SUV was parked with the rear

26  wheels to the curb.  He admitted that marijuana was on the center console where it could be easily seen

27  from anyone outside the vehicle.  However, he denied that he or the other occupants had been smoking

28  / / /

1  marijuana before the officers' arrival.  He told the officers that the car was rented by his girlfriend and
2  that she had left before the officers arrived.

3        At the conclusion of the evidentiary hearing, counsel for O'Hara requested an opportunity to
4  submit supplemental authorities on whether the search of the locked glove box was permitted as part of
5  a lawful inventory search.  The court gave counsel for Plaintiff until Monday, April 29, 2013, to file any
6  additional points and authorities.  However, no supplemental points and authorities were filed, nor did
7  counsel request an extension of time to file supplemental authorities.

8  **DISCUSSION**

9        The Fourth Amendment secures "the right of the people to be secure in their persons, houses,
10 papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth
11 Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S.
12 347 (1967).  The Fourth Amendment protects "people, not places."  *Id*. Evidence obtained in violation
13 of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the
14 poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

15 **I.    O'Hara's Standing to Contest the Search.**

16       A person must have a reasonable expectation of privacy in the place searched to claim a
17 violation of his or her Fourth Amendment rights.  The Supreme Court has enunciated a two-part test to
18 determine whether an expectation of privacy is reasonable and legitimate.  *See Katz*, 389 U.S. at 361.
19 First, the individual must have an actual subjective expectation of privacy, and second, society must
20 recognize that expectation as objectively reasonable.  *Id*.

21       The defendant bears the burden of establishing, under the totality of the circumstances, that the
22 search violated his legitimate expectation of privacy in the place searched or the things seized.  *Rakas v.*
23 *Illinois*, 439 U.S. 128 (1978); *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003).  The ability
24 or "capacity" to seek protection under the Fourth Amendment depends upon whether the person
25 claiming his or her Fourth Amendment Rights were violated has a legitimate expectation of privacy in
26 the invaded place.  *Rakas*, 439 U.S. at 143; *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  In
27 *Minnesota v. Carter*, the Supreme Court held that a person present in an apartment for purposes of
28 / / /

1    bagging cocaine had no legitimate expectation of privacy in the searched premises and, therefore,

2    lacked the capacity, or standing, to challenge the constitutionality of the search.

3         In *United States v. Thomas,* the Ninth Circuit decided, in a matter of first impression, that an

4    unauthorized driver of a rental car could challenge a search of the car.  447 F.3d 1191, 1196 (9th Cir.

5    2006).  The Ninth Circuit rejected the bright line rule adopted by the Fourth, Fifth, and Tenth Circuits,

6    which have all held that an individual not listed on the rental agreement lacks standing to object to a

7    search of a rental car.  *Id.* at 1197.  It also rejected the Sixth Circuit's totality of the circumstances

8    approach and instead adopted the Eighth Circuit's rule, holding an unauthorized driver only has

9    standing to challenge a search of a rental car if he has permission to use the rental car from the

10   authorized renter.  *Id.* at 1197, 1199 (internal citation omitted).  The government argues O'Hara lacks

11   standing to contest the search of this rental car because he was not the renter or an authorized user, and

12   therefore had no reasonable expectation of privacy in the vehicle.  The court finds O'Hara has not met

13   his burden of establishing he had permission from the authorized renter to use the vehicle.  The renter,

14   Emily Samples, left the vehicle at the residence.  Her boyfriend, Sean Deaver, testified he was not

15   aware that she had left the keys in the vehicle until the officers recovered them during a search of the

16   vehicle.  There is no testimony in the record to support a finding that Deaver or O'Hara had permission

17   from the renter to drive the car.  Deaver testified that Samples drove him to the Rue Circle address and

18   left the car behind.  It is reasonable to infer that by leaving the vehicle behind at the residence unlocked,

19   the renter did not object to letting her boyfriend have access to it.

20        In *United States v. Twilley,* the Ninth Circuit addressed the standing of a passenger to challenge

21   the search of a rental car.  222 F.3d 1092, 1095-96 (9th Cir. 2000).  The vehicle was pulled over by a

22   California Highway Patrol Officer for failing to display two license plates.  The officer questioned the

23   occupants and learned the vehicle was a rental vehicle.  The renter was not in the vehicle, although the

24   driver falsely claimed Twilley, the passenger in the back seat, was the renter. The driver told the officer

25   that Michigan only issues one license plate.  The officer continued to question the vehicle occupants

26   about who rented the vehicle.  He received conflicting answers and became suspicious that there were

27   narcotics in the vehicle.  He called for backup and asked the driver if there were drugs in the car which

28   she denied .  When the backup officer arrived, the officer asked the driver if he could search the car and

1   she consented. A K-9 unit with a drug sniffing dog was called and the officer also asked the front seat

2   passenger for permission to search.  The passenger consented.  The drug dog arrived and alerted to the

3   rear of the car where officers recovered twelve kilograms of cocaine.  All three occupants of the vehicle

4   were arrested.  The trial court denied Twilley's motion to suppress finding he did not have standing to

5   challenge the search and that the stop of the vehicle was supported by probable cause.

6        The Ninth Circuit reversed, finding the defendant had standing to challenge the stop of the

7   vehicle even though he had no possessory interest in the vehicle.  *Id.* at 1095.  The court found that the

8   defendant did not have standing to challenge the search directly, but held that if the defendant could

9   establish that the initial stop of the car violated the Fourth Amendment, then any evidence seized as a

10  result of that stop would be subject to suppression as the fruit of the poisonous tree.  *Id.* (internal

11  citation omitted).  The *Twilley* decision held that a defendant has standing to seek suppression of

12  evidence discovered in the vehicle under the fruit of the poisonous tree doctrine.  *Id.*  If the stop was

13  unconstitutional, the court must then consider whether the subsequent search was tainted by the

14  illegality of the initial stop.  *Id.* at 1096.  The *Twilley* court found that the initial stop was

15  unconstitutional because it was based on the officer's mistaken belief that two license plates were

16  required because most states require two license plates.  The officer did not have experience with

17  Michigan registered cars.  His belief was wrong and the stop was therefore not supported by reasonable

18  suspicion and violated the Fourth Amendment.

19       The government argued that even if the initial stop violated Twilley's Fourth Amendment rights,

20  the evidence should not be suppressed because the connection between the stop and the search was too

21  attenuated, citing *Brown v. Illinois*, 422 U.S. 590, 597-60.  The Ninth Circuit found that the government

22  had not shown a break in the chain of events sufficient to refute the inference that the search and

23  resulting seizure were the products of the stop.  *Id.* at 1097.  Rather, the evidence established that the

24  questioning of the occupants and search of the vehicle were a direct result of the illegal stop.  *Id.*  The

25  officer's suspicions were aroused by what he observed following the stop which led to the consent

26  which is a classic case of obtaining evidence through exploitation of an illegal stop.  *Id.*  The evidence

27  should therefore have been suppressed.

28  / / /

11

1    In this case, it is uncontroverted that Emily Samples, the renter of the vehicle, was not present

2    during the stop.  She was Sean Deaver's girlfriend.  Deaver was one of the occupants of the vehicle

3    when the officers responded to this call.  Deaver was not given the keys and there is no testimony that

4    he had permission to use the rental car from Samples.  In fact, he was not aware, until police recovered

5    the keys from the car, that they had been left in the vehicle.  O'Hara has not established that he has

6    standing to directly challenge the search of the rental car.  However, the court finds O'Hara has

7    standing to challenge his initial detention and subsequent arrest, and to seek suppression under the fruit

8    of the poisonous tree doctrine.

9    **II.      O'Hara's Initial Encounter with the LVMPD Officers.**

10   In determining whether a Fourth Amendment violation has occurred, and, if so, whether

11   suppression is warranted, the court begins its analysis with the question of whether the encounter

12   between O'Hara and the LVMPD officers was a seizure. Whether a person has been seized for purposes

13   of the Fourth Amendment is a mixed question of law and fact.  *United States v. Kim*, 25 F.3d 1426,

14   1430 (9th Cir. 1994).  Fourth Amendment jurisprudence recognizes three levels of contact between law

15   enforcement and individuals: consensual encounters; investigatory detentions; and arrests.  Consensual

16   encounters are not seizures and law enforcement is not required to have any reason at all to initiate

17   consensual contacts with individuals.  Investigatory detentions are seizures under the Fourth

18   Amendment and must be based on reasonable suspicion.  Arrests are seizures which require a showing

19   of probable cause.

20   For Fourth Amendment purposes, a seizure of a person occurs when a law enforcement officer

21   in some way restricts the liberty of a citizen, either by physical force or show of authority.  *Florida v.*

22   *Bostick*, 501 U.S. 429, 434 (1991).  A citizen's liberty is restrained if, considering all of the

23   circumstances surrounding the encounter, the police conduct would "have communicated to a

24   reasonable person that he was not at liberty to ignore the police presence and go about his business."

25   *Id.* at 437 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  To determine whether an

26   individual has been seized for Fourth Amendment purposes the court must consider the totality of the

27   circumstances surrounding the encounter.  *United States v. Drayton,* 536 U.S. 194, 202 (2002).  The

28   reasonable person test is an objective one and "presupposes an *innocent* person."  *Id.* (quoting *Bostick*,

501 U.S. at 437-38 (emphasis in original)).  Law enforcement officers do not unreasonably seize individuals in violation of the Fourth Amendment "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *Id*.

For a seizure to occur, there must be there must be either (1) application of physical force however slight by the officer, or (2) submission by the subject to the officer's show of authority. *Hodari D.*, 499 U.S. at 626.  In *Bostick*, the United States Supreme Court recognized the difference between a consensual encounter and an investigative detention.  501 U.S. at 437-38.  There, the police approached Bostick on a bus, did not display any weapons and did not prevent him from leaving the bus.  The police asked Bostick for permission to search his luggage, got consent, and found drugs.  Police conceded that they had no individualized suspicion at all concerning Bostick when they approached him.  The Supreme Court found that this was a consensual encounter that did not trigger Fourth Amendment scrutiny.  *Id.* at 434.  The question was whether a reasonable person in Bostick's position would "feel free to disregard."  *Id*.  The court noted that the police officers used a low-key approach and specifically informed Bostick that he could refuse consent to search his luggage, and concluded that Bostick was not seized for purposes of the Fourth Amendment.  *Id*.

The government relies on *United States v. Washington,* 490 F.3d 765 (9th Cir. 2007) to support its arguments that when the police pulled up to investigate the 911 call, they merely initiated a consensual encounter which requires neither a showing of reasonable suspicion of probable cause.  In *Washington*, a police officer approached Washington who was sitting in a parked car on a Portland street shortly before midnight.  The officer acknowledged he lacked reasonable suspicion or probable cause of any criminal activity.  During the encounter, Washington consented to a search of his person.  He was ordered out of the car, directed away from it, and searched.  He later consented to a search of the car where the officers discovered a firearm.  He was arrested for felon in possession of a firearm and moved to suppress.  The district court denied the motion.  The Ninth Circuit reversed finding that even though Washington voluntarily consented to the search of his person, the encounter escalated into an impermissible seizure, and Washington's subsequent consent to search the car was not voluntary.  The firearm was therefore the fruit of the poisonous tree that followed "in an immediate unbroken chain from his illegal seizure" and should have been suppressed.  *Id*. at 767.

13

1    The court finds that this was not a consensual encounter.   Two officers in two separate patrol

2    cars responded to this call.  Officer Morris testified he positioned his vehicle directly in front of the

3    SUV.  The patrol car was placed in front of the vehicle to prevent the vehicle from leaving.  The

4    officers did not recall whether they drew their weapons when they initially approached the occupants of

5    the vehicle.  Officer Morris testified that, given the nature of the encounter, he did not believe that

6    weapons were drawn.  However, Deaver testified that when he initially saw the officers driving up at a

7    high rate of speed, he got out of the vehicle to go to the house to alert his second mother that officers

8    were present, and was ordered at gunpoint by one of the officers to get back into the vehicle.  The court

9    found him credible in this regard.  One of the officers blocked the vehicle, police gave orders to Deaver

10   and took command of the situation.  One of the officers approached the driver's side and the other

11   approached the passenger side.  A reasonable person in the position of the occupants of the SUV would

12   not feel free to go about their business and ignore the police presence.  The court finds that the initial

13   encounter between O'Hara and the police was an investigatory detention which required reasonable

14   suspicion.

15        An investigatory detention is a brief seizure by police based on reasonable suspicion of criminal

16   activity.  *Terry v. Ohio*, 392 U.S. 1, 26 (1968).  It is a "narrowly drawn exception to the probable cause

17   requirement of the Fourth Amendment."  *Id*.  The police may stop an individual reasonably suspected of

18   criminal activity, question him briefly, and perform a limited pat-down frisk for weapons.  *Id*. at 22-24.

19   An investigatory detention balances law enforcement's need to search and seize against the personal

20   invasion which the search or seizure entails.  *Id*. at 21 (quoting *Camara v. Mun. Court*, 387 U.S. 523,

21   534 (1967)).   Under this balancing approach, important governmental interests justify a brief

22   investigatory detention on less than probable cause.  *Terry*, 392 U.S. at 21.

23        Law enforcement officers may initiate an investigatory detention only if they have reasonable,

24   articulable suspicion of criminal activity.  *Id*. at 21-22.  The government must point to specific and

25   articulable facts, together with rational inferences drawn from those facts, that reasonably suggest

26   criminal activity has occurred or is imminent.  *Id.*  A law enforcement officer who makes observations

27   which reasonably lead him to suspect that a particular person has committed, is committing, or is about

28   / / /

1  to commit a crime, may detain that person briefly in order to investigate the officer's suspicions.
2  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

3       Courts look a the "totality of the circumstances" on a case-by-case basis to determine whether
4  reasonable suspicion existed.  *U.S. v. Cortez*, 449 U.S. 411, 417 (1981).  Inarticulable hunches or
5  generalized suspicions are insufficient.  *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).  Courts must look
6  at the totality of the circumstances in each case to determine whether a detaining officer has a
7  "particularized and objective basis" for suspecting legal wrongdoing.  *United States v. Arvizu*, 534 U.S.
8  266, 272 (2002).  Investigating officers are entitled to draw on their training and experience "to make
9  inferences from and deductions about the cumulative information available to them that 'might well
10  elude an untrained person.'"  *Id*. at 274.  The Supreme Court has recognized that "the concept of
11  reasonable suspicion is somewhat abstract."  *Id*.  The Fourth Amendment is satisfied if the officer's
12  action is supported by reasonable suspicion to believe that criminal activity may be afoot, and
13  observation of factors that are by themselves consistent with innocence may collectively amount to
14  reasonable suspicion.  *Id*. at 273 (internal quotation and citations omitted).  However, to meet
15  constitutional muster, the officer's actions must be justified from their beginning, and "reasonably
16  related in scope to the circumstances which justified the interference in the first place."  *United States v.*
17  *Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 391 U.S. at 20).

18       In this case, the officers were initially dispatched in response to a 911 call made by a neighbor.
19  The 911 caller identified himself by name and provided the number from which he was calling.  This
20  was not an anonymous tip.  A recording of the 911 call was marked and admitted as an exhibit at the
21  evidentiary hearing.  O'Hara argues the 911 call was insufficient to support an investigatory detention
22  because a phone call from an unproven source is insufficient to establish probable cause or reasonable
23  suspicion for the type of seizure that occurred in this case.  O'Hara cites *Florida v. J.L.* to support these
24  arguments.

25       Reasonable suspicion to conduct an investigatory detention may be provided by a tip of an
26  informant if that tip contains sufficient indicia of reliability.  *Adams v. Williams*, 407 U.S. 143, 147
27  (1972).  The relative value and reliability of an informant's tip is assessed in light of the totality of the
28  circumstances.  *See, e.g., Illinois v. Gates*, 462 U.S. 213, 230-35 (1983).  In *Florida v. J.L.*, the

1   Supreme Court held that police officers lacked reasonable suspicion to make a Terry stop when an

2   anonymous caller reported that "a young black male standing at a particular bus stop and wearing a

3   plaid shirt was carrying a gun." 529 U.S. 266, 268 (2000).  The Supreme Court explained that the

4   precise issue before the Court was whether the tip pointing to J.L. had sufficient indicia of reliability.

5   529 U.S. at 269.  Finding the tip unreliable, the Court did not decide under what circumstances a

6   reliable tip would provide the police with reasonable suspicion.  Instead, the Court concluded that

7   because the police only had a "bare report of an unknown, unaccountable informant who neither

8   explained how he knew about the gun nor supplied any basis for believing he had inside information

9   about J.L.", the officers lacked reasonable suspicion to conduct the stop.  *Id*. at 271.

10          In *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004), the Ninth Circuit held that a

11   victim-informant's 911 call bore sufficient indicia of reliability to support reasonable suspicion

12   justifying a *Terry* investigatory stop.  The Ninth Circuit held that 911 calls are entitled to greater

13   reliability than a tip concerning general criminality, because they involve exigent situations police must

14   take seriously and respond to promptly in the interest of public safety.  The Ninth Circuit found the

15   facts in *Terry-Crespo* distinguishable from *Florida v. J.L.* for a number of reasons.  First, the court

16   found as a threshold matter that the 911 call was not an anonymous tip.  *Id*. at 1172.  The caller

17   provided his name and narrowed the likely class of informants by providing identifying information

18   during the recorded 911 call.  *Id*. at 1172.  Second, the 911 call was entitled to greater reliability than a

19   tip concerning general criminal activity because of the need for police to take seriously, and respond

20   promptly to, 911 calls.  *Id*. at 1172.  Third, because the police are able to trace a 911 call, the victim

21   risked losing any anonymity he might have had and criminal sanction under Oregon law for making a

22   false report by making the 911 call.  *Id*. at 1172. Finally, his 911 call was entitled to greater reliability

23   because it provided firsthand information from a victim-informant.  *Id*. at 1172.

24          The court finds the officers who responded to this 911 call had reasonable suspicion to conduct

25   an investigatory detention of the occupants of the vehicle.  The 911 caller reported observing a

26   suspicious SUV occupied by four men engaged in what the caller believed was drug dealing.  The 911

27   caller did not claim he saw any drug deals or weapons.  The officers testified that the neighborhood and

28   / / /

16

1  surrounding area was a high crime neighborhood known for violence and guns with high incidents of

2  drug offenses, prostitution, and burglaries.

3       The SUV was in a cul-de-sac and parked illegally.  Two-thirds of the vehicle was in the middle

4  of the street with its rear tires to the curb and the front of the vehicle facing towards Morris which led

5  the officers to reasonably conclude, based on their training and experience, that it was parked in this

6  manner to quickly leave.  When the officers got out of their patrol cars and approached the SUV, both

7  officers immediately smelled the odor of marijuana emanating from the vehicle.  Cumulatively, these

8  observations gave the officers reasonable suspicion to conduct an investigatory detention.  As Officer

9  Kunz approached the vehicle, he observed a green leafy substance on the center console in plain view

10 which he believed, based on his training and experience, was marijuana.  Deaver testified that the

11 occupants of the vehicle had not been smoking marijuana before the officers' arrival.  However, Deaver

12 also testified that marijuana was indeed on the console when the officers arrived.  Deaver also

13 acknowledged that anyone approaching the vehicle could see the marijuana from outside.  Officer Kunz

14 testified that possession of marijuana is a violation of Nevada law for which an arrest is authorized.

15 The court therefore finds that the officers had reasonable suspicion to order the occupants out of the

16 vehicle to conduct a further investigation.

17      The officers called for a K-9 Officer and drug dog because they had seen the marijuana, the 911

18 caller reported his suspicion the occupants were dealing drugs, and based on their training and

19 experience, a dog is more likely to discovery hidden drugs in a vehicle.  K-9 Officer Ledogar and his

20 dog, Flirt, swept the exterior of the vehicle and the dog alerted to narcotics in the vehicle.  A plastic bag

21 containing numerous individually wrapped, white, rock-like substances in a clear, plastic bag was

22 located between the passenger seat and the center console.  The court finds that the officer's

23 observation of marijuana in plain view, coupled with the 911 caller's report and the dog's alert,

24 established probable cause to conduct a search of the vehicle.  A warrant is not required to conduct a

25 search of an automobile if the officers have probable cause to believe it contains contraband or other

26 evidence of a crime.  *Chambers v. Maroney,* 399 U.S. 42, 51 (1970).  A preliminary search of the

27 vehicle using the drug dog located and recovered additional drugs.  The police therefore had probable

28 cause to arrest the occupants, including O'Hara, for possession of drugs.

**III.    Probable Cause.**

Probable cause is "a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The existence of probable cause is determined by an analysis of the totality of the circumstances surrounding the intrusion.  *Id*.  Probable cause does not deal with hard certainties, but with probabilities.  *Id*. at 241.  Probable cause to search exists if there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238.

The Supreme Court held in *Ornelas v. United States*, 517 U.S. 690 (1996), that a probable cause determination is two-fold.  First, judges must determine the "historical facts," that is, the events that occurred leading up to the stop or the search.  *Id*. at 695.  Second, judges are to decide "whether the historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause.  *Id*. at 696-97.  The *Ornelas* court held that appellate courts must review findings of historical facts only for clear error and must "give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id*. at 699.  However, the ultimate determination of whether probable cause for a warrantless search or seizure exists is reviewed de novo on appeal.  *Id*.

**IV.    Inventory Search of the Rental Car.**

During their investigation, police learned that the SUV was a rental car and that the renter was not present.  The rental car company was contacted and asked that the vehicle be towed. It is undisputed that Officer Kunz conducted an inventory search pursuant to standard LVMPD policy, prior to having the vehicle towed.  He discovered and recovered the two firearms involved in this prosecution which O'Hara seeks to suppress.

"Inventory searches have been held constitutional if they are conducted in accordance with the standard procedures of the agency conducting the search or come under another exception to the Fourth Amendment warrant requirement." *United States v. Ramos-Oseguera*, 120 F.3d 1028, 1036 (9th Cir. 1997), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053 (9th Cir. 2000). Inventory procedures protect an owner's property while it is in the custody of the police, insure against claims of lost, stolen, or vandalized property, and guard the police from danger.  *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

18

It is undisputed that the officers conducted an inventory search of the vehicle pursuant to the rental car company's request that it be towed.  During an inventory search of the interior of the vehicle, Officer Kunz found the keys to the vehicle.  The glove box was locked.  The keys were used to unlock the glove box and Officer Kunz observed two handguns.  The officers were aware, based on their investigation at the scene, that O'Hara and Deaver had felony convictions.  The officers therefore developed probable cause to arrest both for felon in possession of a firearm, a violation of Nevada law.

Both officers testified that it is standard LVMPD procedure to call the Firearms Detail when officers believe they have probable cause for a felon in possession arrest.  Firearm Detective Orth responded to the scene and obtained a state telephonic search warrant to search the SUV.  O'Hara does not challenge the telephonic search warrant.  Rather, he argues the initial encounter with police was an unlawful seizure under the Fourth Amendment, and that all the evidence derived from the initial encounter must be suppressed as the fruit of the poisonous tree.

## CONCLUSION

For the reasons stated, the court has found that the initial encounter was supported by reasonable suspicion, which developed probable cause to search the vehicle and arrest the occupants.  The police conducted a valid inventory search of the vehicle before having it towed at the request of the rental car company, the owner of the vehicle.  The inventory search resulted in the discovery of the firearms in the glove box.  At the time the firearms were discovered, the officers were aware that O'Hara and Deaver were convicted felons.  They therefore had probable cause to make an arrest for possession of a firearm. In short, the court finds that O'Hara's Fourth Amendment rights were not violated.

For the reasons stated,

**IT IS RECOMMENDED** that O'Hara's Motion to Suppress Evidence for Fourth Amendment Violation (Dkt. #25) be **DENIED**.

Dated this 20th day of May, 2013.

Peggy A. Leen
United States Magistrate Judge